(Hamilton County Court of Common Pleas.)

### ANDREW J. PRUDEN *v.* THE CITY OF CINCINNATI.

The City of Cincinnati, by ordinance of its board of legislation, established in Plum street, from Seventh street to McFarland street, a general market, and, for a stipulated annual payment to it, licensed hucksters and others to use designated spaces or stands at the curb for the exposition of their commodities for sale.

The licensees make it their custom to occupy their spaces the evening before market days, with their market wagons, in which they sleep. The spaces are so occupied for three nights each week, and, with such use, and the time precribed for holding the markets, are in almost exclusive use for market purposes not less than sixty hours in each week.

The wagons extend in almost unbroken lines, excepting where there are intersecting streets, for several city blocks, and, with their projecting poles and shafts, occupy a considerable portion of the street.

Frequenters of the market, in wagons, stop in the street, and further reduce the space available for general vehicular traffic, which, for these reasons, seeks other streets parallel with Plum street, thereby affecting its importance as a street, and lessening the value of property abutting upon it.

Much noise arises during the nights preceding market days from the backing up of wagons, the unhitching of horses, the hallooing of men to their horses, and to each other, and, at times, noisome smells are generated in the refuse and litter of the markets.

Plaintiff is the owner of a house abutting on that part of the street whereon the market is established. *Held*:

1. That the plaintiff has a right to the use of the street for access to his house, and egress from it, and for such purposes as are incidental to the use of a house abutting on a street.
2. That the establishing of the market deprived him of that right, and he thereby suffered an injury different in kind from the public generally.
3. That neither the legislature, nor the city had the power to deprive him of that right, without compensation.
4. That the facts constitute both a public and and a private nuisance, which he is entitled to have abated.
5. That a court of equity will enjoin such use of the street, and will decree its discontinuance.

(Decided February, 1895.)

HOLLISTER, J.

The plaintiff is the owner of the property at the northeast corner of George street and Plum street, fronting forty feet on the east side of Plum street. On this property are erected two three-story brick houses, used for business purposes.

The original plat of the city shows Plum street to be 66 feet wide. It is an important street, is so situated that it affords a convenient way of reaching the new City Hall, has no car tracks upon it, and has recently been improved by being paved with asphalt. On July 22, 1892, the board of legislation, by ordinance passed on that day, among other things, provided that "the buildings and spaces used as public markets shall hereafter continue to be used and occupied as such, viz: * * Sixth street from College street to Mound street, and Mound street, from Sixth street to Fifth street, and Fifth street, from Mound street to Stone street, and Plum street, from Seventh street to Water street, to be designated as Sixth street market space."

The annual rental "of the outside benches and stands" was fixed at $20.00, to be paid to the city, and the owners or occupants of benches, stands or wagons are required to "provide their benches or stands with a suitable vessel, tub or barrel to hold all of the refuse matter which accumulates at their stands," and are required to remove the same after the close of the market.

It was also ordained that "keepers of stalls, benches or stands * * in the streets * * shall, within one hour after ringing of the bell for the closing of the markets, cause their provisions and vehicles, if they have any, or anything that was placed in the streets by them, to be removed from the market space, together with all animal or vegetable or other refuse matter dropped on the street by them * * and all refuse matter to be removed from the market space."

It was also ordained that markets for the sale of all articles usually sold in markets should be held in the Sixth street market on Mondays, Thursdays and Saturdays "from daylight in the morning to 11 a. m., and that on Saturday evening market in the Sixth street market should be held, commencing at 12:30 p. m. and ending at 10 p. m.

By virtue of this ordinance, the city, through its officers and agents, has rented and assigned to divers persons market stands and spaces on Plum street, between Seventh street on the north, to at least as far as McFarland street on the south, for the sale of such articles as are usually sold in markets; and has assigned places for wagons in the street, which, backing up against the curb, occupy almost, if not quite solidly, the entire street on its east side between said streets, excepting the space taken by the intersecting streets.

The owners of stands, in order to be ready for the morning market,

make it their custom to occupy their spaces the evening before market days with their wagons, in which they sleep. It is in evidence, and is most probable, that much noise is made in the evening hours by the backing up of wagons, the unhitching of horses, the conversation and hallooing of men, and generally by the nature of the situation. The wagons, with their projecting shafts and poles, occupy a considerable part of the width of the street; purchasers in wagons, grocers and others, frequently stop in the street, thereby, at times, much further reducing the width of the street available for general vehicular traffic, so that such traffic tends to, and frequently does seek other streets running parallel with Plum street. This diversion of the north and south travel can not fail to affect the importance which Plum street should have as a leading thoroughfare in the active part of the city, and tends to lessen its value for general business and residence purposes.

It is in evidence that between Seventh street and Fourth street, some of the corners of intersecting streets command high rentals for saloon purposes, and a large number of the houses fronting on Plum street are used for purposes of prostitution. It is probable that the proximity of the Sixth street market has contributed largely to give the locality its unfortunate character. The situation in this respect is intensified by the establishment of the market on Plum street. While it appears that values of some of the abutting property on Plum street continue large, when the property is given over to such uses as were adverted to, yet it is fairly shown that plaintiff's property and the property in the vicinity, has a tendency to, and does decrease in value, by reason of the market on Plum street.

It is in evidence also, that noisome smells emanate from decaying vegetable matter and refuse, easily borne, perhaps, by some, but very offensive and even unhealthy, to many people.

Making these facts the ground of his complaint, the plaintiff prays the interposition of a court of equity by injunction.

The city has the undoubted right, by legislative enactment, to provide, by ordinance, for the erection of market houses and the establishment and regulation of markets. Rev. Stat., 1692, section 26; and by section 2576, "may appropriate, enter upon and hold real estate within the corporate limits for market spaces, erect market houses, establish and regulate markets and market places for the sale of meats, fish, provisions, vegetables and other articles necessary for the sustenance, convenience and comfort of the inhabitants, * * * and prescribe the kind and description of articles which may be sold therein, and the stands or places to be occupied by the vendors."

By section 2232, also, power is given the city to " appropriate, enter upon and hold real estate within its corporate limits * * * for market space."

And it is provided by section 2640, that " the city council shall have the care, supervision and control of all public highways, streets, avenues, alleys, sidewalks, public grounds, and bridges within the corporation, and shall cause the same to be kept open and in repair and free from nuisance." But no specific authority is given the city or any of its boards to establish a market in a street. See *Gall* v. *Cincinnati*, 18 Ohio St. 563.

The fee of Plum street is in the city for public purposes. The spreading on the record in 1802 of the plat by Israel Ludlow; the use of Plum street since that time by the public for street purposes, must be held to have invested the city with the title to the street as a public trust. S. & C., 1483; Chase, 1846. The statute, section 1692, subdivision 18, gives the council power to provide, by ordinance, "to lay off, establish, open, widen, narrow, straighten, extend, keep in order and repair and to light streets, al-·

leys, public grounds and buildings, wharves, landing places, bridges and *market spaces* within the corporation."

But the public purposes for which a street is so held in trust are the purposes for which streets are usually used, or which, when the streets were dedicated or otherwise acquired, were in contemplation at the time the street became used as such. The nature of the use has frequently been determined by our courts. Streets are for public travel. The duty is enjoined on the authorities to keep them free from obstruction. Any obstruction is a nuisance which the city, through its proper officers, may have abated. In this way, the public is protected in its rights to free and unobstructed travel. The council (board of administration) has also power-er to grant certain rights to *quasi*-public corporations, such as railroad companies, telegraph and telephone companies and the like, and to street railway companies to lay tracks, erect poles and string wires, etc.; in the case of street railway companies, because the use of the streets by them is only an amplification of a proper use of the street, fairly in contemplation of all parties when the streets were dedicated; in the other cases, because the legislature wisely enlarge the uses to which streets are ordinarily put. *Railway Co.* v. *Lawrence*, 38 Ohio St. 41; *Street Railway* v. *Cumminsville*, 14 Ohio St. 524; *Crawford* v. *Delaware*, 7 Ohio St. 459; *Mt. Adams & Eden Park Ry.* v. *Winslow*, 3 C. C., 425; *Smith* v. *Central & C. Tel. Co.*, 2 C. C. 259; *McLean* v. *Electric Light Co.*, 9 Bull. 65, and other Ohio cases.

But in all of the other cases will be found the principle that for any additional burden imposed on the owner of land abutting on a street by reason of any legalized construction therein, he must be recompensed in damages, provided only that his damage is different in kind, and not only in degree, from the injury the public generally sustain. See, also, cases cited *in re the application of the C. N. O. & T. P. Ry. Co.*, to vacate certain streets in Cincinnati. Court Index, Cincinnati, June 30, 1894, Vol. 2, No. 175. (See, also, 1 Nisi Prius Rep., —).

The right of a lot owner in the street is clearly described by SWAN, J., in *Crawford* y. *City of Delaware*, 7 Ohio St. 459, on page 469: "Distinct from the right of the public to use a street is the right and interest of the owners of lots adjacent. The latter have a peculiar interest in the street, which neither the local nor the general public can pretend to claim; a private right of the nature of an incorporeal hereditament legally attached to their grounds, and the erections thereon; and incidental title to certain facilities and franchises, assured to them by contracts and by law, and without which their property would be of comparatively little value. This easement, appendant to the lots, unlike any right of the lot owner in the lot of another, is as much property as the lot itself." And it is immaterial whether the fee to the street is vested in the city or in the abutting property owner. *Railway Co.* v. *Cumminsville*, 14 Ohio St. 524; *Railway Co.* v. *Lawrence*, 38 Ohio St. 41. The same cases hold that injunction will lie by the property owner against the railway company, imposing additional burdens upon him or causing him to suffer a different injury from the public at large until he has been compensated for his loss.

The authorities referred to are more especially directed to cases of injury arising from the cutting off or obstruction of the access to and from the owner's property. He may also recover for substantial injury or loss to his property not common to the community at large, caused by smoke, noises and sparks of fire occasioned by running locomotives and cars along a track in front of his property. *Railway Company* v. *Gardner*, 45 Ohio St. 309.

The discussion so far has, as it seems to me, led to the irresistible conclusion that it is without the power of the legislature or the board of legislation, or of any *quasi*-public corporation or of any person to take away or

injure, without compensation, a man's right of access to his premises from the street, or by ordinance or act, to impose on him any burden peculiar to his situation, and not shared in by the public generally.

Even if it were granted that the legislature, under the authority it has to enlarge the use of a street, could give the board of legislation power to establish a market therein, yet the lot owner, for any injury resulting therefrom, different in kind from that suffered by the public, is entitled to compensation. The obstruction to the access to the street from his house, and from the street to his house, is a damage he alone suffers.

On this subject the Supreme Court has spoken most positively in the case of *Branahan* v. *Hotel Company*, 39 Ohio St. 333. The Cincinnati Hotel Company was the owner of a perpetual lease to the property on the southwest corner of Fourth street and Central avenue, on which was constructed the building known as the Grand Hotel. On the Central avenue side are an entrance to the hotel, and seven store rooms, rented and occupied separately from the hotel. Access to the store rooms is had from Central avenue. The city of Cincinnati passed an ordinance under which Branahan and others appropriated and occupied as a stand for their hackney coaches the west side of Central avenue, next to the hotel property.

Among other things the court say: "The supervision and control of the public highways of a city is a public trust, and while additional uses may be imposed, not subversive of, or impairing the original use, such as laying down gas and water mains, yet the rights of the·public to use it as a street, and of the adjacent lot owner to enjoy it as the means of access to his property, can not be materially impaired," and "equity will enjoin until compensation is made," "where additional burdens are imposed even for a public purpose."

And the court most pertinently remark, at page 335: "Even if, as is suggested, this (hack stand) is in the nature of a public use, *like a market*, the city could not appropriate it to such use without proceeding according to law."

And on this exact point, BEASLEY, C. J., says in *State* v. *Laverack*, 34 N. J. L. 201, at page 205: "I regard, then, a right to hold a market in a street as an easement additional to, and in a measure inconsistent with its ordinary use as a highway. The question therefore, is presented, can such easement be conferred by the legislature, on the public, without compensation to the land owner? I have already said, . . . this question must be answered in the negative."

But, it is urged by the defendant that the city has a right to establish such a market as this, as contra-distinguished from a market-house, in a public street, and cites Harrisburg's Appeal, 19 Am. and Eng. Corp. Cases, 603, Supreme Court of Pennsylvania, 1887, wherein it is said: "The right to use the street is sustained, upon the ground that the inconvenience to the public, occasioned by the temporary obstruction of the streets, is more than counter-balanced by the increased facilities thus afforded for the sale and purchase of the necessaries of life." In support of this proposition the court refer to *Attorney-General* v. *Mayor of Cambridge*, L. R. 6 H. L. Cas. 303; *Case of Nightingore*, 11 Pick. 169; *Denehey* v. *Harrisburg*, 2 Pears, 330.

However this may be, it does not touch the question raised in this case, which is one of the legislative and municipal encroachment upon individual property rights, without compensation therefor.

Plaintiff's right of access being established, has he other rights in the premises?

The making of loud noises in the night time, causing disturbance in a neighborhood, is a nuisance. *Rex* v. *Higginson*, 2 Burr, 1233; *Commonwealth* v. *Oaks*, 113 Mass. 8; *Commonwealth* v. *Smith*, 6 Cush. 80; Wood on

Nuisances, sec. 611, and cases cited thereunder, also section 617. Noisome smells are nuisances, and interfere with a man's right of comfortable enjoyment of his property; Wood on Nuisances, sec. 561. Injury to property abutting on a market, by reason of the diversion of travel to other streets, because of the obstruction caused by a market, is distinctly recognized in *Herrick* v. *City of Cleveland*, 7 C. C. R. 470. In that case the city of Cleveland had constructed a market-house at the intersection of Sheriff street, Broadway and Woodland avenues.

Around the market-house was a sidewalk, against the curb of which wagons of persons having commodities for sale were backed. The space occupied by the wagons and street cars on the tracks in the street, the crowds of people on the sidewalk between the wagons and the market-house so interfered with the convenient use of these streets by the public as to divert from them public travel along other streets and business therefrom which would naturally have sought these streets. It was held on demurrer that these facts constituted an element of damage to the value of the property, both of persons whose property abutted on these streets and opposite the market-house, and of persons whose property was on these streets in the vicinity, and that the plaintiffs were entitled to a mandatory injunction "requiring said city to abstain from the further obstruction of said streets, and from the further maintenance upon the same of the said market-house, and from the use of the same for such market stands, and from hereafter letting or leasing or licensing said stalls or market-house and the said space along the line of said street as places for the sale of commodities," and ordering the city to "abate the nuisance thereby occasioned, and to remove from said streets its said market-house and all obstructions in and about the same or used in connection therewith, and to restore such portion of said streets so occupied by said market-house in such condition as will enable them to be used by the public as and for public streets and thoroughfares."

See, also, *Hites* v. *City of Dayton*, 6 Bull. 142, a case directly in point. Hites & Hull had a store in the Odd Fellows' Temple at Dayton. The city leased to hucksters and others the curbstone space in front of their store for market purposes. These individuals sold the same line of goods as the plaintiffs. The Superior Court of Montgomery County granted a perpetual injunction against leasing the curbstone space. Both of these cases are singularly free from citation of authority, but are right in principle, as I think and have endeavored to show. But eminent authority may be found elsewhere, not only as to the grounds upon which plaintiff may have relief, but the extent to which the court can grant relief.

In the case of *McDonald* v. *City of Newark*, 41 N. J. Eq. 136, the complainant owned a dwelling-house on Park Place in Newark, New Jersey, between which and Broad street was a triangular open space or park. The authorities permitted hucksters of country produce to occupy for their business, the west side of Park Place and the east side of Broad street, including the sidewalks. The stands were opposite and in the immediate vicinity of complainant's house; wagons were backed up to the curb, and the hucksters sold their wares on the sidewalks. Complainant's house was near the front or small end of the park. He complained of loud noises and offensive smells. "The noise is of the stamping of horses' feet, the rumbling of wagons, the rattling of chains and harness, the shouting of men to their horses and to each other, the throwing of barrels and boxes from the wagons to and upon the sidewalks, the hawking of the goods and the hum and bustle of the crowd of purchasers," a condition of affairs very like the facts complained of by the plaintiff in this case. Odors also arose from refuse and smoke of torches.

The Chancellor, Runyon, among many pertinent things, says: "The entire street is for the use of the public at large, and the unauthorized use

of a part of it for a market is a public nuisance." Citing *State* v. *Laverack*, 34 N. J. L. 201. " Nor," says he, "does the grant, by the officers of the city, of permission so to use the street legalize such use. The use is not only a public nuisance, but it is, so far as the complainant and others similarly affected are concerned, a private nuisance also. Where, as in this case, an individual is specially injured by the unauthorized use of a street, he may have recourse to this court for relief." This case, as does *Herrick* v. *Cleveland, supra,* expressly holds that the city is the proper defendant.

In the case of *Schaff* v. *City of St. Louis,* 117 Mo. 131, the Supreme Court of Missouri, where the facts were almost identical with those in the case at bar, at least so far as cutting off access to private property is concerned, hold that the ordinary uses of a street are consistent with their use for gas, water and sewer pipes, and even for the erection of telephone poles.

"But," the court go on to say, " it does not follow * * * the city may lease out portions of the streets for huckster stands and stalls.' A general power to regulate the use of streets can not, and ought not to be construed to give the city a right to create a nuisance in the streets, or devote them, or any part thereof, to any purpose inconsistent with the right of the public or abutting property owners."

It is clear that the plaintiff is entitled to relief—but to what extent? The mere removal of the wagons from that part of the street included within his lot lines produced, would give him access to and from his property, but would not relieve him from the injury his property receives by reason of the diversion of travel from Plum street, caused by the existence of the market therein. That relief can only be obtained by removing the entire cause of the obstruction of Plum street, to wit, the market itself. Manifestly, if the market remained on Plum street, between Fourth and Fifth or Sixth streets, all northward travel, excepting for market purposes, emanating in Fourth street, or in the region south of Fourth street, would seek other streets than Plum, and similarly all southward travel would be diverted from Plum street, all to the injury of plaintiff's property. The city claims that plaintiff is a contributor to his injury in that there is constructed as a means of entrance to his house, several steps and a stoop, which project into the sidewalk space several feet, and that, therefore, equity will not grant him relief. It is probable that the crowding of people on the sidewalk in front of the house is partly attributable to this obstruction; but it is apparent that the crowding of the sidewalk is a very small part of the grievances of which the plaintiff complains.

It should be borne in mind that the obstructions and nuisances complained of are not of a mere temporary character—annoyances to which the public and individuals must necessarily be subjected to, from the very nature of things, such as bales and boxes deposited on the sidewalk, in the process of loading or unloading freight in front of business houses, or full, awaiting actual delivery into a man's cellar, or constructions in front of new buildings in process of erection, or such like temporary interferences with the absolute free use of the street; but obstructions and nuisances existing, as the evidence shows, for more than sixty hours each week.

A decree may be taken in accordance with this opinion.

*W. L. Dickson,* for plaintiff.

*Fred. Hertenstein* and *F. Hassaurek,* for the City.